Your Honor, we begin by, which we emphasize in the brief, we think the Supreme Court decision in the Hazel Atlas case that the Supreme Court issued in 1944 lays out the appropriate standard that all courts in the United States of America are obliged to follow under the doctrine of stare decisis, vertical stare decisis. All courts are bound to follow binding precedence by the U.S. Supreme Court. Okay. I agree. I agree with that. And so if we look at the really breakdown of the three critical, what are the essential distilled elements of Hazel Atlas? And they're quite simple. There's three of them. The first one is that in Hazel Atlas, as in our case, the Mark O. Destin, L.L. Wings case, the attorneys for Hartford, they were instrumental in drafting a portion of the article that was submitted to the USPTO office and that obtained, allowed Hartford to obtain the patent. It was later found out that the attorneys had actually drafted, the attorneys for Hartford had actually drafted a portion of that article. After they had, the attorneys had drafted the article, the attorneys then submitted the articles to the USPTO with a clear intent to attain an illegitimate patent for the gob feeder, is what they called it. So it was, and then the attorneys went further and they took what they knew to be an illegitimate patent based on a gob feeder, based on an article they had drafted, and they submitted that into evidence. The article. The article into evidence with the circuit court of appeals, and it, the circuit, the circuit court of appeals relied on that article. And quoted it. Yes. To reverse the district court having found there was no violation of the patent by Hazel Atlas. But wouldn't you say, wouldn't you say that in terms of that being a fraud on a court, that that's more direct than what we have here? Yes, Your Honor. It's a lot more direct. It's really, first of all, the Hazel Atlas speaks to a scheme, not just one little independent one-off act, a systematic scheme to defraud not only the district court, but the scheme went to the patent office. And I postulate that the facts that what Mr. Bennett Krasner did in this case is a lot more egregious than what the attorneys for Hartford did. The attorneys for Hartford, they actually believed that there was a basis for the gob feeder to get a patent, and they believed in the article. But the Supreme Court said, we don't care that you may have been right when you put in, you wrote the article. But the truth wills out. You should have said you wrote the article. And by deceiving the PTO by not telling them you wrote the article, we don't care if it's true or not. We don't care if you had a reasonable belief. You lied. And in this case, it's important to remember Bennett Krasner was there, was L&L Wayne's attorney. He was, if you look at the docket in the district court, the original district court action, he was listed as lead counsel for L&L Wayne's. Bernard Bennett Krasner, he also was the one who signed the applications that went to the PTO that resulted in the issuance of the illegitimate fraudulent patent that Mr. Krasner then saw fit to immediately rush over before the inks even dried on it and submit it into evidence on the eve of summary judgment to win the infringement case. Because when you submit the registration, especially late in the case, the case had been going on for a couple of years. I'm not sure that that's, I mean, the district court didn't disagree with that. It just said that you guys had a reasonable opportunity to figure all this out long ago, right? Well, that's the third. That's the critical distinction. That's not the issue, though, is it? No, well, that is the issue, Your Honor. I agree with you a hundred percent. But if you look at the Hazel Atlas, it says in there, it addresses that specific issue. It says that if you go out and defraud the patent office and then use the fruits of your to win the case, then guess what? We do not think the diligence or lack of diligence of the party who was defrauded is an issue. Because, and what makes this case distinguishable from all the other fraud on the court cases, which aren't really fraud on the court cases, is the fact that you have a legitimate public interest in having a reputable, believable trademark and patent system. So by going and getting a fraudulent trademark, basically, they're not just harming Marco Destin. They're harming all the citizens of the United States. And the Supreme Court was quite clear on that. But this is an equitable remedy, right? Yes, it is. Okay, so equitable remedies generally require you to show a couple of things, including that you were diligent or that you were prevented from finding out about this problem because of something that the other side did. So that's what the district court found is that you didn't do that. So, I mean, why is that wrong? You should be saying that that is not even a consideration. That drops off the table when there is a fraud to the patent office. Is that your argument? That is my argument. And it's not my argument. It's the very words of the U.S. Supreme Court. They said that the diligence or lack of diligence of the defrauded litigant to uncover the fraud does not affect the public interest protections that the court needs to take. We have to protect our public institutions regardless of whether the party defrauded was diligent or not. We're going to protect the U.S. Patent Office and our citizens' ability to have faith and rely on patents and trademarks. So the Supreme Court said that due diligence does not matter. It does not defeat what is a true hazel app as fraud on the court case. And I don't think anybody in this Court, maybe you disagree with it, but the fact is that's binding. That is the standard applied to a true fraud on the court case that involves a public institution like the U.S. Patent Office. Those are not my words. Those are the Supreme Court talking. And I would say that I do — I don't want to step on anybody's toes, but I think the case, with all due respect, was misled a little bit by this Court's opinion in the Motley Money case, which was a Second Circuit case, 2023. Now, the problem with that case — and this is really what I think sort of tripped up the district court. In that case, this Court sided to the Martina Theodore case, which was a Second Circuit case from 1960, and it also sided to Moore's federal practice. Unfortunately, what the Court failed to cite to in its analysis was hazel atlas, which has the applicable standard. So what the Court did is they forgot or just did not mention it, did not apply it, and did not extinguish it. Because if you look at Motley case, you don't really need to even talk about hazel atlas because it's not applicable. The fact is there was no fraud by the counsel involved in the case. There was no fraud on a public institution in the case. The Motley case was your stereotypical fraud between litigants. I mean, we call it fraud on the Court, but I'm not so sure. The fraud's really between the two litigants. Well, I think, Mr. Murphy, you're way over at this point. So do you want to hear Mr. — Mr. — Yes. Yes, go speak to the patent issues. Thank you, Your Honor. The reason I'm going to address the trademark issues here is because the lower court found that there was, just on a motion to dismiss, not a fully developed record, that there was a failure of due diligence to discover a trademark license that should have put our client on that there was a fraud. And there are a number of problems with that. The first one is it was not a developed record. We don't know on the record here what diligence was taken in the first case because discovery is not of record. And so there's no way to know whether diligence was exercised. Secondarily, diligence would not have, on this record, would not have disclosed the license. The license was not recorded with the Patent and Trademark Office. Recording a trademark license is optional, even if you have a registration. Right. But, I mean, you could have asked in discovery where you are noticed to say there might be other mark holders, and that's a question you wouldn't want to ask in deposition or through an interrogatory. Well, that's very easy to find out. In fact, that clause, which the district court relied very heavily on, really tells the licensing nothing more than a quick glance at the Patent and Trademark Office website would show. We know that there were hundreds of WINGS-related registrations. And all this clause that the district court relied upon says there are other individuals who have registered trademarks or service marks to mark WINGS. If you then go to, as the Fourth Circuit opined in the Beachmark case, if you then go to the Patent and Trademark Office and look, you're going to find hundreds and hundreds of registrations, which you would have known about even without this clause. So that really put them on notice of nothing and, in fact, served, I submit, to further the deception by saying, well, there are these registrations, but it's a classic half-truth which deceived them by saying, oh, and by the way, failing to say, oh, and by the way, we have taken this mark by license. We don't actually own it, contradicting what it says. But the agreement said there may be claims that are paramount to this one. That would only be the case if the term, if the word WINGS was used for clothing and not if it was used for a drug, for example. Well, that's a graduated matter. The Trademark Office does consider how close the goods are in deciding whether there's a conflict, whether they're going to give a registration. And there's another diligence issue. I mean, the CFO of your client knew all about this and remained silent for seven years before bringing this lawsuit. Let's, well, that's a separate issue, Your Honor, respect. It's a matter of diligence. It's the same issue. It's a matter of diligence. But that, the fraud occurs in 2007 during the lawsuit there, before this license is brought to our client's attention. And the license, it was brought to our client's attention during a deposition. And the license on its face does not tell anyone that the license was still in effect when L&L WINGS gave its license to Marco Destin. The license your Honor is referring to dates to 1993. The license given by L&L WINGS to Marco Destin dates in 1998. There's nothing to tell the CFO that, oh, that license is still in effect or that license usurps, let us say, the rights that L&L obtained by almost 30 years of use. And that's mentioned in the district court's opinion. Use, of course, is what obtains rights rather than registration in the United States. So, and I do want to point out, the fraud occurred, the fraud on the court, in the initial litigation that began in 2007 and ended in 2011. And the question then becomes, really what your Honor is raising afterwards is a matter of latches, whether the Marco Destin should have acted more quickly after 2011, after it entered into this stipulated judgment. And that... It's, I mean, the relief you're seeking is equitable, and so you can call it latches, you can call it whatever you want, but these are considerations that courts entertaining equitable remedies consider, right? And Mr. Murphy is saying no. Mr. Murphy is saying that Hazel Atlas says that if there's any kind of fraud to a government entity like the PTO, well, then you don't consider anything else. It's basically strict liability. I'm making a subordinate argument, Your Honor, that even if the ordinary rules of due diligence or inquiry notice apply here, they do not apply in the facts, or at least the district court on a motion to dismiss, not having looked into the entire factual history that was not before it, after 2011, should not have decided that point. There are many considerations involved in latches that the district court did not have before. District court also did not consider the countervailing information that Mark Lodeston has that would have deterred it from going further. Namely, they knew about the use, long-time use by L&L Wings, which gives trademark rights. They had assurances in the license. They had no knowledge of any third-party claims, adverse claims to this trademark. There's no third party cropped up. There were all the reasons to assume that the assurances that L&L gave of its exclusive ownership of this trademark were correct. And the brush fire that they had with this license some years later, 2015, in depositions, I submit was not enough to put them on inquiry notice at that point. But again, that's during a period that the district court should look into for all its determination, either as an equitable matter in latches and not on a motion to dismiss, which is what we have below. Your Honor, I see I'm over my time. Are there any other questions I can address? No, thank you. Thank you. All right. We'll now hear from Mr. Gluckstein. You guys are splitting up five and five, is that right? Yes. Yes. Your Honor, what starts out this matter is the license agreement dated November. Which appellee do you represent? I represent the Levy appellees, Shaul, Mayer, and Ariel Levy, who were sued as agents for L&L Wings because they couldn't sue L&L Wings because of a release in a bankruptcy proceeding. So we're missing an essential party, but that's not the central issue on this appeal. The issue on this appeal, Your Honor, starts with paragraph 11.3 of the license agreement dated 11-1-1998, starting chronological order. 11.3 is absolutely clear that there's a warning that there are or may be paramount rights to L&L Wings. That doesn't mean that every single trademark that uses it or patent that uses the name Wings is an issue here. Now, there's no state— If somebody looked then, would they have found the Morrow filing? I believe so, but that could be— I mean, you believe so, but I mean, Wings or not— Yes. They would have found the Morrow filing in the—they would have found it if they'd done a patent search. They didn't even do a patent and trademark search, and this was Moses and Singer representing Marco Destin at the closing in November of 1998. This was sophisticated counsel representing sophisticated parties. They didn't do the most basic trademark search. And when the litigation broke out in May of 2007, the question was never asked, are there paramount— Well, that's interesting because your adversary says that had they looked, they would have found lots of Wings registrations, but not one for clothing and not the Morrow one. And you're saying that they would have. I'm saying that— So, I'm puzzled. Say they didn't even—they didn't even try. Well, that's not the point. The question is—my question is if they looked, would they have found? Was there is the other way to put my question. Your Honor, I believe it was. Now, going on to—paragraph 11.3 put them on notice that there was a—that there were probably significant equities senior to them. Then litigation broke out. That triggered a panoply of rights. But are you defending, I guess, what happened here? I mean, it seems to me that that's a tough argument. It's one thing to say that they were on notice, they should have figured this out. But are you conceding that they were misled? No. You're not? No. And I'm also—I'm also stating that when the litigation broke out in May of 2007, we don't—there's nothing in the record, and now the burden would be on appellants to put in the record that there was ever any inquiry at that time as to the—as to whether or not there was—what the senior equities were. It was certainly sharply focused at that point. Judge Swing, in her decision, addressed this issue aptly. I'm just looking in the Swing decision. And Judge Swing found that the MDI license agreement gave Marco Destino's license to use in the wins market and defined territory for a definite term until October 31, 2006. The litigation broke out after that date in 2007. And what's important to note is that Barbara Jones did not give them judgment on the trade—on the trademark issue. Barbara Jones gave them judgment on the contractual liquidated damages issue. So one has to look in detail at what Barbara Jones gave them judgment on. So one year—so the point is, when you get down to the timeline, the settlement agreement was so ordered on February 15, 2011. One year after that date was February 14, 2012. There was no motion made to overturn the judgment. Now, if they—if Marco Destino was on notice on August 7, 2013—not 2015, 2013—of the—of the Morrow agreement, they still did nothing. And they admitted in their opening brief that they made a prudent—in paragraph 65, actually, of the complaint—that they made a deliberate decision and stated, indeed, to wait the outcome of the Beachward case would be the only prudent thing to do, as the Beachward case was before a Federal district court for which would determine some issues. Whether L&L committed fraud before the PTO and its licensees, and whether L&L was truly the licensee of Morrow and not the trademark owner. And this goes far beyond the issue of latches. This goes to the issue of a deliberate decision. Now, if we go to the Ackerman v. United States decision in 1950, the Court stated,  because he did not feel an appeal would prove to be worth what he thought was a required sacrifice of his home. All right. I guess it's probably worth hearing you respond to Mr. Murphree's argument that Hazel Atlas basically provides for a strict liability for a litigant like your client that made false statements to the Patent Office. I don't believe that Hazel Atlas says anything of the kind. And also, Hazel Atlas has been severely restricted by the United States v. Beggarly decision of 1998, which states that it's only the most extreme cases that give rise to an independent action to vacate a judgment beyond any timeline. So it's going through a timeline. So August 7, 2013 comes and goes. Nothing is done within a reasonable time thereafter. This, the district court in the Hilliard-Curtis decision, granted it was a 1957 decision, held that four months was too long after a party learns that the time has come and gone. So when, in your view, did the clock start running on these guys? So when should they have known that, uh-oh, the 2011 stipulated judgment was procured by a fraud, so they should have gone to the court? Was it, you're saying it was back at the time that they, even before they negotiated the settlement? So you're saying it's after the Beachmark disclosure? I'm saying at the latest. It was August 7 of 2013. But I'm saying that there was discovery that was not done. Now, page 29 and 30 of the opening brief of appellants states that it was an economic decision not to pursue discovery. It's right in their brief. In the original? In the appellant's opening brief that was filed in December of 2023. So it's in the opening brief. They made a deliberate decision. They made a deliberate decision, you know, not to do anything as of August 2013 or February 2015. So there's a cascade of deliberate decisions here, Your Honor. And I do not believe this court would open up unimaginable floodgates if, for every overlook of something in the record, somebody would come back and they'd get an idea in the middle of the night and say, oh, yes, I'm going to vacate the stipulation, or I'm going to move the vacated judgment. The court's docket would swell alarmingly. As it is, Your Honor. Interesting. I mean, you view this as not an extraordinary and unusual situation. People are all the time saying that they are the mark holder when, in fact, they don't have the mark. They knew they didn't have the mark. And they actually had a license with the guy who did and then stopped paying him and just treated it like an unregistered one. That's common. I'm saying that it's not relevant to this case. And I'm saying that that's not the case. It's not relevant to the case before this court. So then, it's clearly relevant, right? I mean, that's what makes the prospect of equinequitable remedy even possible. The only reason where this suit can be brought is because there is this fraud, right? How could you say it's not relevant? There's an allegation of fraud. And we're taking the allegations of the complaint as true as we must under FRCP 12-B6. And it seems like the North Carolina court was ruling on this. Yes, but there's a different agreement without the warranties of paragraph 11, without the disclaimers of paragraph 11.3. OK, but it did disclose that statements about who owned the mark were false, right? It's pretty hard to square the North Carolina court's findings with representations made prior to the stipulated judgment in this case. Would you agree with that? No, because we're dealing with different documents, different agreements. We have paragraph 11.3 in our agreement. What do you mean different agreements? Agreement, what agreements are you referring to? The license agreement of March, of November 1st, 1998. And the agreement, I believe, is 2005 between Beach Bar, Inc. and L&L Wigs. Different agreements, different documents. Different agreements, but involving different trademarks? Different, it's still two different agreements. So we didn't warrant anything in the 1990s. They're different licensing agreements about the same trademark, right?  Am I missing something? No, Your Honor. But I still think that there is an obligation to take action before 10 years after a stipulation is entered into more than 10 years. The action was taken in September of 2022. That's the 22-6-8-4-5-9 action was brought to more than 10, you know, I'm trying to think how many years that would be. More than 11 years after the stipulated order was entered, and almost 10 years after they were on more than an inquiry notice. I understand. We can do the math. Anyway, we're way over for you. So let's hear from Mr. Richards. Thank you, Your Honor. May it please the Court. Representing Bennett Krasner, the attorney for L&L in the original action. In March 2023, Your Honors, this Court rendered a decision in Mazi v. Money Store, articulating the rule that in order to obtain relief under Rule 60D, the plaintiff must assert that the defendant interfered with the judicial system's ability to adjudicate impartially, and that the defendant's conduct was of such a nature as to prevent the plaintiff from fully and fairly presenting its case. On appeal, Your Honors, appellants argue today that this Court's decision in Mazi articulates the incorrect standard for relief under 60D, and that the Supreme Court's decision in Hazel Atlas articulated that proper diligence is not a required element for inquiry before this Court on fraud on the Court claims. First, Your Honors, the Supreme Court in Hazel Atlas did not determine that the plaintiff's diligence is irrelevant to determining whether or not there was a fraud on the Court claims. In Hazel Atlas, the Supreme — You mean you would grant that a court has an independent interest representing the public interest, a very important one, and not being deceived? That's correct, Your Honor. The Court does. And in Hazel — Why would that turn on the diligence of the person who has been defrauded, somebody else who's been defrauded, in the same way, by the same person? That's correct, Your Honor, and that is part of the factual outline in Hazel Atlas. But what appellants did not explain to this Court just now is that there were more facts to prevent the petitioner in Hazel from understanding the fraud on the Court. Particularly, the attorneys for Hartford had submitted a fraudulent publication to the USPTO, and then they were granted a patent. They took both the article and the patent to the Court in furtherance of their claims against Hazel for patent infringement. But that's not where the fraud ended. What Hartford did next was more egregious. When Hazel caught wind of what Hartford's attorneys had done, Hartford — Hazel had sent investigators to the supposed disinterested expert that apparently drafted this article. Unbeknownst to Hazel's investigators, Hartford had sent its own representatives to speak with the expert, and then they demanded an affidavit from that expert. Hartford even paid the expert to continue to conceal the fraud and then submitted the expert's affidavit into the Court to prevent Hazel from learning who the true author was of the publication that they used to obtain the patent. That's not what happened here, Your Honor. What happened here is quite differently and distinguishable in the facts. Appellees here submitted a trademark application. And afterwards, the USPTO sent an office action. In response to that office action, Bennett Krasner stated that the last known owner of a similar mark is Shepard Morrow, and that it is his belief — They had stopped using it. They had stopped using the mark. And so what we have in Hazel Atlas is a detailed plan to commit fraud on the Court. What we have here before you, Your Honors, is at best — at best — perjury. And under Hazel Atlas, the Supreme Court stated that perjury is not enough to obtain relief under 60D. You need more. You need to show that you were prevented. And that's exactly what happened to Hazel. They were prevented from obtaining information about who drafted the article. Now, on appeal today before Your Honors, appellants argue that, well, the North  Carolina District Court and say, well, LNL engaged in discovery abuse there, so they would have engaged in discovery abuse here in the Southern District of New York in the original action. The question before Your Honors today is not whether or not LNL would have engaged in discovery abuse. The question before Your Honors today is whether or not NDI was prevented — Marco Destin was prevented from obtaining information about Shepard Marr. And they weren't. So that would have required, then, just a trademark search? That's all it would have required? Well, first, Your Honor, it could have involved a trademark search. But first, what Marco Destin could have done was take their license agreement and see that they had acknowledged under the license agreement that other entities had paramount rights to the mark. They could have then deposed any — any principle of Marco Destin — of LNL about this trademark provision. Well, they didn't do that after the suit. Even before the suit, they could have done a trademark search, right? Absolutely, Your Honor. They could have done a trademark search. And there were entities at the time, as there are now, that trademark attorneys use to determine who owns certain marks out in the world. Okay. And this case — I mean, after the litigation commenced, yes, they could have done depositions. They could have had interrogatories. Discovery went on for a while, it seems like. The case was brought in 2007 and resolved in 2011. How far did they get in discovery? It's not clear in the record before us today, Your Honors, because this case was decided on a 12B6 motion. And that's because appellants did not show that they were prevented from obtaining information about the Shepherd Moral License. And they didn't plead it. They didn't plead it. That's correct. And they say that, you know, LNL engaged in this discovery abuse and that it would have cost them — sorry, Your Honor. For our purposes, is there any difference between fraud on the — on the office and fraud on the court? So appellant makes an argument about that today before Your Honors. And I don't know that there is, because this court in 2020 affirmed a Southern District of New York case, and that case is Marshack v. Shepherd. And in the case, this Court recognized that plaintiff argues only that the defendant made allegedly false — false representations to the PTO, and that this Court in turn relied on those representations. This Court thereafter affirmed the district court's decision dismissing that complaint, agreeing that the registration application to the Patent and Trademark Office for the Mark at Issue did not constitute fraud on the district court. So perhaps maybe there's fraud on the court, there's fraud on the — on the USPTO, and appellant argues that when there's fraud on the USPTO, that's more egregious than when there's fraud on the court. I don't know whether that's true or not. But what I do know — Well, I mean, the district court here, Judge Jones, did rely on the representations about the fact that there was a registration that had now been filed after discovery in the summary judgment. So is that not a fraud on the court? What happened here, Your Honor, is the district court did receive the certificate of registration of the Wings Mark in the original action, and Marco Destin had the opportunity to rebut that prima facie ownership in the original action. They did not. They did not marshal any evidence to say that, well, no, L&L does not own the Mark. And they could have because they had their license agreement, which reflects that other entities had already registered the Mark and had paramount rights to the Mark under Section 11.3. Could that have reasonably been construed as a reference to folks who registered the Mark for shoes or oranges or private jet plane services? Or chicken. I mean, that's what I was thinking. There are — Your Honor, I checked, and there are plenty of registration marks for Wings, for chicken wings. And — but there is a way to filter your search and determine whether or not there are registrations for the Mark for clothing. And that's something, although I'm not a trademark attorney, I believe most reasonable trademark attorneys would engage in, learning whether or not there's a Mark in the same category as the Mark they're litigating over. That was not done here, Your Honors. None of that was done here. And that's why Judge Swain correctly dismissed Marco Destin's fraud on the court case before Your Honors today. All right. Well, I think we're way over with you, too, Mr. Richards, but we've been asking the questions, so I guess that's our prerogative. We'll now hear from Mr. Murphy for two minutes of rebuttal. Thank you. I'm going to try to go through this quick. Just going to Hazel Atlas, counsel's presentation of what Hazel Atlas knew is just incorrect. If you look at page 5 of this, the Hazel Atlas opinion, it says, at the time of the trial in the district court where the article seemingly played no important role, the attorneys of Hazel Atlas received information that both Clark and one of Hartford's that the Hartford lawyer was the true author of the article. So Hazel Atlas knew about the purported fraudulent article that ultimately led to the issuance of the patent during the original district court litigation. So that's the record that the Supreme Court was looking at when they said, we don't really care about the diligence or lack of the defrauded plaintiff if you have actually went out and defrauded the patent office. And I just want to give briefly. So I'm just trying to understand this. So Campanello imports, which basically tells us what is the standard when there is a motion for equitable relief like this. You're saying it's wrong? It's inconsistent with Hazel Atlas? With a motion under 60b-3? No. That would be consistent with your due diligence requirements. I think there's some confusion or just misstatements of what is fraud between litigants, where somebody lies during a deposition, which happened in the Mazzi case. It was lies about deposition, what documents were available. Those are really fraud between the parties. Obviously, it's before the district court, so it affects it. But it's not what happened here, where you have a party's counsel going out, defrauding the patent of the U.S. Trademark Office, getting a trademark. And then on the eve, remember the summary judgment had been filed. On the eve of the ruling on summary judgment is when Mr. Krasner saw to really make sure there'd be no way to uncover his fraud. He made sure he submitted the fraudulent registration that he obtained by defrauding the patent office on the eve of the court ruling on summary judgment. The court relied on the registration, right in the opinion, saying that the registration gives rise to a presumption of validity, that they own it. So I think that's disingenuous. And I also think, you know, really, I'm not sure. Discovery had closed. And we didn't have, they had not presented the registration of their trademark until they submitted it in evidence. I'm not quite sure what we could have done. And it's the court's position that if you're presented with a presumptively valid registration of a trademark, we're supposed to, Marco Destin should have went to the USPTO and done a full-blown audit of the file that they used, that L.L. Wing submitted, to determine whether it was, in fact, free of fraud or not. I think that would be asking a lot for limiting it to go look under the hood of a trademark application to determine whether there was fraud or not. And the other point, I think, was it's very, but I just wrote briefly from Hazel Atlas. But look, the thing is, but even if Hazel did not exercise the highest degree of diligence, Hartford fraud cannot be condoned for that reason alone. This matter does not concern only private parties. These, there are issues of great moment to the public in a patent suit. But that, I mean, it seems to me what you're arguing, then, is that any independent action based on fraud on the court is not discretionary. It's, the district court has no discretion and has to vacate. That's what you're saying. Well, I'm hesitant to go on an all or nothing rule, but I tend to think what we're dealing with is a very, very, fortunately for the courts, this kind of egregious fraud doesn't happen all that often. So what does happen almost every day in court is some party lies or fibs about his testimony or her testimony. That's what most of these cases go to and the due diligence about that. But this is a rare species of fraud where you've actually, a party went out to win a lawsuit. They defrauded the PTO and then knowingly put the fraudulent application into the district court to win. And I think it's all squared with Hazel Atlas. I would say a couple of things about, and I think that I think we're going to have to cut it short. We have your briefs and certainly we've got our money's worth on arguments. So thank you. Okay. Thank you, Your Honor. It was a pleasure. We will reserve decision, of course. Thank you very much. Thank you, Your Honor.